## Marksberry, et al. v. First National Bank of Owensboro.

(Decided February 28, 1922.)

### Appeal from Daviess Circuit Court.

1. Bills and Notes—Consideration—Defenses.—One who makes a note to a bank, receiving a valuable consideration therefor, cannot afterwards defend a suit for collection of the note on the ground that he was misled or deceived by a fraudulent statement issued or made by another without showing that the payee in the note was responsible for or participated in the fraud which induced the making of the note.

2. Bills and Notes—Notes of Corporations to Bank—Defenses.— Where two or more stockholders in a failing corporation undertake, at the urgent request of the officers and agents of the corporation, to make notes to a bank sufficient to cover overdrafts of the corporation at that bank, and in order to induce the stockholders to make said notes, the corporation through its officers and agents prepare and read in a stockholders' meeting of the corporation, a statement showing the assets of said corporation to be much in excess of its liabilities, the payors in the notes thus obtained cannot avoid liability on the notes by merely charging that the bank to which the overdrafts were due was interested in securing solvent persons to make such notes as would secure the overdraft.

3. Fraud, like other facts, must be proven and cannot be presumed.

4. Corporations—Defenses to Note Executed to Bank.—A stockholder and director having access to the books of a corporation and opportunity to make an examination of the financial condition of the concern, cannot be relieved from the payment of notes made by him to a bank by showing that certain directors and officers of the bank had reason to suspect that the corporation was in a failing condition at the time the notes were executed.

BEN D. RINGO, CLEMENTS & CLEMENTS, M. L. HEAVRIN and W. C. MASON for appellants.

E. B. ANDERSON and W. FOSTER HAYS for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

This appeal is from a judgment for $23,000.00, obtained by the First National Bank of Owensboro against H. Marksberry and S. J. Vance on five several notes, of which the said appellants and one Paul Scherm were the makers and endorsers. All the notes bear date September 13, 1920. The first one for $3,000.00 is made payable to S. J. Vance and signed by H. Marksberry and Paul Scherm. It is endorsed in blank by S. J. Vance.

The second note is for $5,000.00, payable to S. J. Vance and signed by H. Marksberry and Paul Scherm, and is endorsed in blank by S. J. Vance. The third note is for $5,000.00, made payable to Paul Scherm and signed by S. J. Vance and H. Marksberry and endorsed in blank by Paul Scherm.

The fourth note is for $5,000.00, made payable to H. Marksberry and signed by S. J. Vance and Paul Scherm, and is endorsed in blank by H. Marksberry. The fifth note is for $5,000.00, made payable to Paul Scherm and is signed by H. Marksberry and S. J. Vance, and endorsed in blank by Paul Scherm. Each note was due six months from date, and is in the following form:

"Owensboro, Kentucky,

March 13, 1920.

"$5,000.00.

"Six months after date we promise to pay to the order of —————————, negotiable and payable at the United States National Bank, Owensboro, Kentucky, five thousand dollars for value received, with interest at the rate of (6%) six per cent from date until paid, and to pay an attorney's fee of ten per cent, in case payment shall not be made at maturity.

"Presentment demand of payment, protest, notice of protest, and diligence in suing and dishonor are each waived by the drawers and endorsers of this note. And sureties, drawers and endorsers consent that time of payment may be extended from time to time without notice.

"————————————————.

"————————————————"

In its petition the plaintiff bank averred that all of said notes were duly endorsed to and received by it in due course for value before due. Scherm was not a party to the action, being out of the jurisdiction of the court. The defendants, Marksberry and Vance, filed separate answers, by which they interposed several defenses, including fraud, covin and misrepresentation on the part of the plaintiff's agents in obtaining the notes.

On this appeal Marksberry and Vance insist that the judgment should be reversed because the trial court erred in giving a peremptory instruction to the jury to find for the plaintiff bank. This insistence is based upon the assumption that the evidence, offered by appellant,

proved fraud on the part of the bank and its agents in procuring them to execute said notes and to assign and transfer the same to the bank. This fraud is predicated upon the theory that one Toon, who took an important part in the plan to obtain the notes for the bank, was the agent of the bank and procured and caused to be published to appellants a false and fraudulent statement of the financial condition of the Owensboro Products Company, the real beneficiary of the notes, which at the time was a going concern but in failing condition.

The five notes, which are the basis of the judgment from which Marksberry and Vance appeal, grew out of the following facts:

About a year before the execution of the notes the Owensboro Products Company was incorporated with a capital of $500,000.00 divided into $250,000.00 preferred stock and $250,000.00 common stock, shares of $100.00 each. The object of the corporation was to install and operate a manufacturing plant for the milling, sacking and marketing of stock food and the canning and marketing of vegetables. Certain persons, including Mr. Toon, were engaged by the products company to sell its preferred stock, and were to receive a commission of twenty per cent on the sale thereof and all of the common stock of the company. A great many persons were induced to take stock in the corporation, among them being appellants, Vance and Marksberry. Vance subscribed for $25,000.00 of the preferred stock, while Marksberry became the owner of $6,500.00 thereof. The plant was put in operation and had been going along for some months before the execution of the notes in March, 1920. The company was greatly in debt both for its plant and machinery, and for grain and other supplies to be used in its manufacturing business. It kept an account with the plaintiff, First National Bank of Owensboro, and also an account at the United States National Bank in that city. About the first of February, 1920, when it became hard up for money it began to kite its checks between the two banks. It would draw a check upon one of said banks for several thousand dollars and take it and deposit it in the other bank, and the latter bank would send it through its usual course, which would occupy two or three days, but before it would be received at the bank on which it was drawn in Owensboro the products company would draw a check on the other Owensboro bank sufficient to cover the first check and deposit that check

in the bank on which the first check was drawn, and thus the company would appear to have a balance in that bank sufficient to take care of its first check. In this way it appeared to have on a given day a balance in its favor in one of the banks, although it was greatly overdrawn at the other. This system was regularly worked by the products company for more than a month, and up until a national bank examiner came to Owensboro for the purpose of examining the banks. When the examiner discovered that the products company was kiting large checks between the two Owensboro banks he immediately called upon the banks, not only to stop the kiting system employed by the products company, but to require the products company to make good an overdraft which it then had at each of said banks, amounting to $50,000.00 in all, of which $23,000.00 was due the plaintiff bank and $27,000.00 due the United States National Bank. The banks, of course, were very anxious to have this indebtedness secured at once, and they actively set about to have the products company secure this overdraft. As the products company was already indebted to each of the banks in the full amount which the banks by law could loan to a single individual or corporation, it was necessary for the overdraft to be secured in some way other than by the notes of the products company. About this time Mr. Toon, who had been stock salesman for the products company, appeared in Owensboro, and the banks besought him to assist them in getting the overdraft of the products company arranged. This was about March 12, 1920. That night Mr. Toon called appellant Marksberry over the phone and invited him to come down to the hotel, which Marksberry did. Some other persons interested in the products company were also at the hotel to meet Mr. Toon. At the opportune moment Mr. Toon very diplomatically informed Marksberry and the other stockholders of the products company that their company was greatly involved and financially embarrassed, and that the national bank examiner had discovered the overdraft of $50,000.00 at the two banks and was demanding that it be secured at once, and Toon asked appellant Marksberry if he would sign notes with others to make this overdraft good. After some consultation concerning the matter Marksberry called up appellant Vance, who then lived in Illinois, some fifteen or twenty miles from Owensboro, and invited Vance to come down to Owensboro for a conference. Vance came and stayed all night

with Marksberry, and they talked the matter over privately, but neither of them was willing to sign the paper of the products company unless it was solvent and entirely able to take care of its obligations. On the next day, March 13th, a meeting of the directors and officers of the products company was had in the office of the company, at which Mr. Toon and representatives of the two banks were present. In the meeting Mr. Toon stated that Messrs. Marksberry and Vance were there for the purpose of signing notes to make good the overdraft to the banks provided the financial condition of the products company was satisfactory to Marksberry and Vance. Thereupon it was suggested that the secretary of the products company get up a written statement of the condition of the corporation and have it ready for a meeting to be held at two o'clock that afternoon. The meeting then adjourned to meet again at two o'clock. All the persons who attended the meeting in the forenoon were at the meeting in the afternoon, and in addition thereto came Mr. O'Brian, then a director in the appellee First National Bank and now president of that institution. After the meeting came to order the secretary of the products company appeared with a book and sheet of paper, from which he read a statement of the financial condition of the corporation showing its assets and liabilities, the former much greater than the latter. At the conclusion of the reading of the statement every one present appeared to think the corporation entirely solvent, and whispered conversations to that effect passed around the room. Thereupon Vance, Marksberry and Scherm executed and delivered the five notes which are the subject of this litigation, and the bank officials then present received the notes and took them to the bank. Within a few minutes after the officials of the appellee bank had left the meeting, word was sent back by those officials to those in the meeting at the office of the products company that the products company should execute to Marksberry, Vance and Scherm a note equal to all the notes executed by the three named men to the banks, and this the products company did. About the time this note for $50,000.00 from the products company to Marksberry, Vance and Scherm was delivered to the payees by the officials of the products company a large block of the common stock of the products company was, by one of the officials of said company, passed to Marksberry, and a like amount to Vance and Scherm, which

each of these gentlemen received, accepted and took away with him. The relief given the products company by the execution and discount of the notes aforesaid was temporary only, for it was but a few days before the products company was again in financial difficulties. A large number of cars of grain, shipped to the products company with bills of lading attached were then standing on the railroad tracks near the plant of the products company, unloaded because the products company was unable financially to pay the drafts and receive and unload said cars, although they needed the grain and other supplies to carry on their manufacturing business. These facts were known to Mr. O'Brian, a director of the appellee bank, for he conducted a warehouse in the district where the products plant was located, and had occasion to and did know at different times of the inability of the products company to take up the bills of lading and to receive and unload shipments of grain. Indeed, this condition, which had prevailed for some weeks before the execution of the notes in controversy, was well known to O'Brian at the time of the making of the notes. There is some evidence in the record that indicates that other officials of appellee bank, including its cashier, Mr. Russell, had information that the products company was in strained financial condition before the making of the notes.

Appellants' claim that the notes sued on were procured by fraud is largely predicated upon the averment that Toon was the agent of the bank and was so acting at the time he sought out Marksberry and Vance and first attempted to induce them to make good the overdraft, and continued to act for the bank at the two meetings of the stockholders of the products company to which we have referred. All of which, it is insisted by appellants, was but a part of the fraudulent plan and scheme of appellant bank to saddle its losses on to the back of Marksberry and Vance. We have carefully examined the evidence to find what relation, if any, Toon bore to appellee bank and what connection he had with the products company. It appears that, at the time of the organization of the products company, Toon was one of its chief boosters and stock salesmen. In floating the stock of the products company it was necessary for Toon and his associates to exploit the prospects, advantages and opportunities of the products company and to boost the whole proposition. No doubt this was done, for the

stock was sold and the company set in operation. Some of the purchasers of stock did not pay the full price in cash but bought it upon the installment plan and the stock was put up as collateral to notes. In this way Toon continued to be interested to some extent in the success of the products company. The stock sales had been closed some time and Toon had been out of the city. When he returned, about the 10th or 11th of March, he was informed of the overdrafts of the products company at the banks. One of the witnesses, in testifying about what Toon said to him concerning the overdraft, stated that the banks "grabbed him" as soon as he came to town. To any good business man it was evident that the products company would be compelled to arrange its overdraft or else go out of business. If it went out of business its stock would immediately become worthless. So the only course for a stockholder to pursue, with money invested in the products company's stock, was to keep the concern going. No doubt Toon realized this because it was but the natural conclusion of one acquainted with stock companies. If this was not the motive that induced him to solicit Marksberry, Vance and Scherm to sign the notes in suit, we are at a loss to know what moved him to take such an active hand because we do not find a line of competent evidence to connect Toon with appellee bank. He was not an officer or agent of that institution, so far as the record shows, at any time. He had never been employed by that bank, and, so far as the evidence shows, he had never even had a deposit or loan there. While some of the witnesses undertake to construe Toon's conduct in the meeting of the directors of the products company to indicate he was speaking for the bank and acting on its behalf, the evidence rather indicates that he was speaking for the products company and endeavoring to secure the indulgence of the banks toward that company by saying to the banks that the products company had found solvent persons who were about to consent to make paper to take care of the overdraft. It was not only the duty of the products company to make good this overdraft, but its manager and officers well knew that if it did not immediately arrange the overdraft at the banks, steps would be taken by those institutions that would close the products company and put it in the hands of a receiver. Thus situated, it was the products company that was praying the indulgence of the banks.

The judgment of the court below holding appellants liable on the five notes to the bank is based, it is asserted by counsel for appellants, upon the conclusion of that court that, as Marksberry was a director and Vance a stockholder of the products company, each was charged with knowledge of the financial condition of that company and cannot be heard to say that they were misled by the fraudulent statement of the condition of the products company procured by the agents of the bank, if it was so procured, and counsel further assert that the trial court based its conclusion upon the case of Hibernia Bank & Trust Company v. Cancienne, 140 La. 970. In that case a director of a commercial corporation, in need of money, signed a written continuing guaranty by which the director undertook to be liable for money then due, or thereafter loaned or advanced to the corporation by the bank to the extent of $15,000.00. When sued upon this continuing guaranty the successor of Cancienne pleaded that the signature of Cancienne to the instrument was obtained by fraud and misrepresentation, and that the obligation was not binding. In considering this defense the court said: "The question of solvency or insolvency of the Sugar Planters' Storage & Distributing Company at the time these guaranties were signed is a matter of no importance whatever. The evidence shows that the capital stock of the corporation was paid in, but that the corporation had no funds with which to buy molasses except what money it borrowed from the Hibernia Bank & Trust Company. It was to secure the loans made and to be made for that purpose that these guaranties were signed. It is presumed that Mr. Cancienne, as a director of the Sugar Planters' Storage and Distributing Company, had knowledge of its financial condition and transactions. The directors of a corporation are trustees, and its creditors, like the stockholders, are the *cestui qui trust*. On account of that fiduciary relation of the directors to the corporation and to its creditors, the directors are under a certain moral obligation to see that its creditors are paid." As the trial court did not deliver any opinion we are unable to determine upon exactly what principle he arrived at the conclusion embodied in the judgment from which this appeal is prosecuted, but we are convinced from a careful examination of the record that the judgment is correct and must be affirmed, whatever may have influenced the trial court to enter it. The unwarranted, if not fraudulent statement, prepared and read

to the appellants and others at the meeting of the directors of the products company and the bankers in the offices of the company on March 13th may be said to have been the procuring cause of Marksberry and Vance coming to the financial rescue of the products company and executing the five notes in suit. If, however, the appellee bank induced or brought about the false statement issued by the products company to influence appellants, Marksberry and Vance, to sign the notes in question, and these appellants were unacquainted with the financial condition of the company and had no reasonable opportunity of knowing thereof, and were deceived and misled by said false statement, the falsity of which was known to appellee bank and its agents, into executing the said notes, the fraud of the bank so perpetrated would render the notes unenforcible. We do not, however, find sufficient evidence in the record to warrant us in holding that the bank contributed in any manner to bring about or cause the officers of the products company to issue the statement of date March 13th, concerning the solvency of the products company, and which statement, it may be said, is largely, if not entirely, responsible for Marksberry and Vance engaging to take care of the overdraft of the products company by executing the five notes in suit. Of course, appellee bank was very anxious to have the overdrafts secured. That was but natural. It was vigorously after the officers of the products company in an effort to cause them to act on behalf of that company and make some suitable adjustment of the unsecured indebtedness of the products company to appellee bank. There was nothing improper or fraudulent on the part of the bank about any of this unless the bank, through its agents authorized to speak for it, made some false representations or did something that misled Marksberry and Vance to their injury. Fraud, like other facts, must be proven and cannot be presumed or inferred except from proven or admitted facts. It was not the bank in trouble but the products company. At that time the products company was a going concern, apparently holding a large amount of assets, including real property, buildings and machinery. The assets of that concern, as cast up by its secretary on March 13th, were $850,000.00. While the bank may have known that the products company was in need of money, it was not charged with the duty of looking into the financial condition of that concern more than to see that its

paper taken by the bank was good and collectible. If A owes B a sum of money and is unable to pay it, may not B insist upon A securing the obligation, and is B under the legal necessity of saying to C, whom A procures to become his surety, that he (B) does not believe that A's assets are equal to his liabilities, and that C may be required, in the course of events, to pay the money owed by A to B? The mere statement of this proposition is sufficient to refute it. Here the products company owed the bank a large sum of money which the bank was anxious to collect and was calling upon the products company to make good. Persons associated with the products company and interested in its success were approached and asked to make an effort to secure this indebtedness to the bank. Marksberry and Vance were large stockholders in the products company and were, therefore, interested in its success. They were appealed to by other persons interested in the products company to sign paper which could be transferred to the bank in behalf of the products company, and thus relieve the products company of the overdraft. Without a representation of any kind, so far as the record discloses, from appellee bank or any one in position to speak for that institution, the appellants, Marksberry and Vance, on a statement prepared and read to them by Stone Williams, secretary of the products company, showing the assets of that company materially greater than its liabilities, willingly executed the notes sued on and delivered them to the officers and agents of the bank. Whether this was done with the hope and expectation on the part of appellants of receiving from the products company a note of like amount to save them harmless, or appellants were induced to execute the notes with the hope of saving what they had already invested in the stock of the products company, or with the hope of receiving, as they did on that occasion, a block of the common stock of that association, it is wholly unnecessary for us to determine. There was sufficient consideration for the execution of the paper by appellants to the bank, and, as there is no evidence to sustain the charge of fraud on the part of appellee bank, the judgment must be affirmed.

It is a general rule of long standing that a director of a corporation must exercise reasonable care to know the condition of the corporation of which he is a director, and to know the truth of statements concerning its financial condition issued by such corporation, and it is a rule

concurred in by this court that directors are liable to those relying on such reports if false, although the report was made by the corporation without knowing of its falsity, but without the exercise of ordinary diligence to know the facts. 7 R. C. L., pages 486 and 487; City of Franklin v. Caldwell, 123 Ky. 528; Allen v. Neal, 134 Ky. 690. It was, therefore, at least the duty of appellant Marksberry to exercise reasonable diligence to know the facts concerning the financial condition of the corporation which he was attempting to direct, and he had the right as a director to inspect its books and to know its actual condition. Appellant Vance also had a right as a stockholder to know the condition of his company and to inspect its books. They were unwilling to sign paper for the use and benefit of the products company until the financial condition of that company was made known to them. Appellants had the means of knowing the truth about the condition of the products company, and with the exercise of reasonable diligence on their part could have known all the facts, or at least sufficient facts, to have protected them in the transaction, but they did not take the pains to make proper investigation to learn the true condition of the corporation.

It is argued by appellants that one or more of the directors and officers of the appellee bank knew that the products company was in hard circumstances. Granting that this is true, appellants knew these facts, and knowing them should have exercised greater diligence to acquaint themselves with the real situation existing with the products company before signing paper for it. The situation of appellants, Marksberry and Vance, is indeed deplorable, but it is not the province of courts to make new contracts for litigants, but to construe and enforce those which they, in furtherance of their own private affairs, entered into upon what appeared to them good and sufficient reasons.

Judgment affirmed.